NOTICE

Decision filed 06/09/26. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2026 IL App (5th) 260068-U

NOS. 5-26-0068, 5-26-0071 cons.

IN THE

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| *In re* WYATT C. and ANYIAH C., Minors | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | De Witt County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | Nos. 25-JA-8, 25-JA-9 |
| | ) | |
| Patrick C., | ) | Honorable |
| | ) | Karle E. Koritz, |
| Respondent-Appellant). | ) | Judge, presiding. |

_____

JUSTICE McHANEY delivered the judgment of the court.
Justices Hackett and Clarke concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The dispositional order that found it to be in the best interest of the minors to be made wards of the court and placed in the custody and guardianship of the Illinois Department of Children and Family Services (DCFS) is affirmed because the circuit court's findings were not against the manifest weight of the evidence and the selected disposition was not an abuse of discretion.

¶ 2    The respondent, Patrick C. (Father), appeals the circuit court of De Witt County's January 27, 2026, dispositional order. Father challenges the circuit court's finding that he was unfit and unable to parent the minors and asserts that the circuit court abused its discretion in finding that removal of the minors from his custody was in their best interest. For the following reasons, we affirm.

1

¶ 3                                    I. BACKGROUND

¶ 4     On October 7, 2025, the State filed petitions for adjudication of wardship for Wyatt C. and Anyiah C., the children of Father and Ashley B. (Mother).[1] The petitions alleged in count I that the minors were neglected in that their environment was injurious to their welfare in that Mother had been found unfit in De Witt County case Nos. 23-JA-22 and 23-JA-23, had not been restored to fitness, and that Father possessed methamphetamine in the home of the minors on October 6, 2025. 705 ILCS 405/2-3(1)(b) (West 2024). Count II alleged that the minors were neglected in that they were not receiving the proper or necessary support including adequate food, clothing, and shelter in that Father allowed the minors' residence to contain human and dog feces, inoperable sinks, smell of feces, black mold, moist clothing throughout the house, a hole in the ceiling, Wyatt's bed was dirty without a sheet, Anyiah's bed was not accessible for sleeping, and the totality of the circumstances rendered the minors' home inadequate for their residency. *Id.* § 2-3(1)(a).

¶ 5     A temporary custody order was entered on October 8, 2025, placing the minors in the care of a foster parent. The circuit court found probable cause for the petitions because Mother was previously found unfit and had not been restored to fitness, and Father possessed methamphetamine in the minors' home, and the home was in disrepair. The circuit court granted temporary custody of the minors to the Guardianship Administrator of DCFS.

¶ 6     The matter proceeded to an adjudicatory hearing on January 8, 2026. Mother admitted the allegations of count I that pertained to her. The State provided a factual proffer, asserting that in De Witt County case 23-JA-22 and 23-JA-23, the minors were found neglected due to Mother's illicit drug use and she was never restored to fitness. As Father did not admit to the allegations, the

_____

[1]Mother was a party included in the petition, but she is not a party on appeal.

matter proceeded to hearing. The State first called Father. Father testified that he was the biological father of the minors and the children were residing with him in Clinton, Illinois, on October 6, 2025. The only people who lived in the residence were Father, his girlfriend Tamara Moore, and the minors. On October 6, 2025, Mother was at the home with her boyfriend, helping to get the minors ready for school. Father stated that on the morning of October 6, 2025, law enforcement showed up at the home to execute a search warrant. Father declined to answer any questions about the search as it pertained to the pending methamphetamine charges against him, invoking his fifth amendment right.

¶ 7　　Father then described the home, stating that it was a one-bedroom home but there were "two other areas set up" where the minors slept. There were bunk beds set up in the living room for Anyiah, and Wyatt's bed was in the small dining area. Father and Tamara slept in the bedroom. The minors' sleeping arrangements did not have any doors and were not separate from the living area. Father testified that he had an indoor dog as a pet, and the dog likely went to the bathroom in the mudroom that morning, as he had not been let out yet. The mudroom was near the area where Wyatt slept. As to the human feces in the toilet, Father stated that somebody could have left it there instead of flushing it. Father said there were no plumbing issues in the house and the standing water in the sinks was from Anyiah and Tamara doing their hair and "leavin[g] water in the sink."

¶ 8　　When asked about the black mold allegations, Father said that there was a roof leak in the ceiling, but he did not believe it was black mold. Father was aware of the leak, but was not in the process of fixing it because he did not have the money to correct it. The leak had been going on for two months, and Father placed a bowl beneath the leak when it rained. Father stated that he was on "good terms" with Mother regarding the minors, and she was at the home that day.

3

¶ 9    Father testified that he was not sure if Wyatt's bed had a sheet or not, and it was likely dirty because "he's a young boy and he plays a lot, plays in dirt, and I'm sure it was a little dirty." Father stated that Anyiah slept on the couch because she liked to watch television before falling asleep, but her bed also had clothing on it, which the State described as "not accessible for sleeping." Father was not sure if there was moist clothing in the home because Tamara did the laundry, but the minors usually had their clothes hanging up or in a dresser.

¶ 10    Father testified that he had home surveillance video cameras facing the back and front of the property, in the garage, and in the living room. The cameras displayed the footage on a monitor in the garage. There were also two sheds on the property, and sometimes Father would permit people to stay in the sheds.

¶ 11    On cross-examination from Father's counsel, he testified that the dog was "generally house trained," but would defecate or urinate in the home "off and on" depending on when the dog was let outside to use the bathroom. Father or Tamara would clean up after the dog if that happened. The home was only one level, so the hole in the ceiling did not "create a fall hazard" and when it rained, the leak would only "drip" into a bowl. As to people staying in the shed, it would only be sporadically and for two or three days at a time, and the people would be allowed inside the house if Father was home.

¶ 12    On cross-examination from the guardian *ad litem* (GAL), Father testified that he was not sure if the feces in the mudroom from the dog that morning was the only feces in the house. Father stated that the people who stayed in the shed would only have access to the house and bathroom if Father was home, but they did not have access throughout the night.

¶ 13    The State then called Detective Lindemulder, who testified that he was a detective with the De Witt County Sheriff's Department assigned to assist the Illinois State Police Task Force 6. As

4

part of the task force, Lindemulder investigated allegations of delivery of illicit narcotics and drugs. Leading up to October 6, 2025, the investigation incorporated multiple controlled buys of illicit drugs, oftentimes with a court order for an eavesdropping device. Lindemulder sought and obtained a search warrant for Father's house due to controlled buys of cocaine and methamphetamine out of a garage at the residence, and Lindemulder obtained information that Father and Tamara had knowledge of the activities on the property.

¶ 14 The search warrant was executed on October 6, 2025, and law enforcement found illicit drugs and paraphernalia in the garage, inside the house, and a "big shard of methamphetamine in an ice maker in the kitchen." The kitchen was a common area accessible to all occupants of the house. When the search was conducted, Father, Tamara, Mother, Mother's boyfriend, and the two minors were in the house. Lindemulder spoke to Father at the scene and at the jail. Father admitted that the drugs and paraphernalia were his. The drugs tested positive for methamphetamine. Father told Lindemulder that he "normally smoked methamphetamine in the garage," but occasionally smoked methamphetamine before he went to bed. Father indicated to Lindemulder that "he was aware that there were some issues out in his garage," but did not state that he "absolutely knew what was going on." When Lindemulder told Father that there were controlled buys out of his garage, Father provided the correct name of who sold the drugs in his garage.

¶ 15 On cross-examination from Father's counsel, Lindemulder testified that neither Father nor Tamara admitted to receiving drugs in exchange for letting people use their property. Father admitted that the methamphetamine and paraphernalia in the bedroom were his, but denied knowing about the methamphetamine in the ice machine. Father stated that he normally used methamphetamine in the garage to "avoid being around the children," but "needed to have some at night" and brought it into his bedroom.

¶ 16    On redirect examination from the State, Lindemulder testified that Father informed him that Tamara "occasionally" used methamphetamine. As to the "shard" of methamphetamine found in the ice maker, the machine did not have a lock on it and it was accessible to anyone within the house. Upon inquiry from the court, Lindemulder stated that the ice machine was a stand-alone appliance located in the floor of the kitchen.

¶ 17    The State then called Sergeant Benjamin Wilford of the Illinois State Police, who testified that he assisted in executing a search warrant for narcotics at Father's residence. Wilford stated that he went through the entire house and the buildings on the property, describing the home as "disheveled" with clothes piled up all over including on the bunk bed and that there was a "path" to get through the house. Wilford said that while he was searching through the clothing in front of the washer and dryer, he stopped due to the presence of animal feces. In the kitchen, Wilford observed "what looked like black mold on the ceiling above where the sink was" and a "hole that looked like you could see the rafters" above the stove. The bed in the small dining area, Wyatt's, was "dirty," with the mattress ripped and the box springs visible. Where Anyiah slept on the couch, there were baskets of clothes, some dry, some moist. In the bathroom, the sink was full of water and there was fecal matter in the toilet.

¶ 18    Wilford testified that he spoke with Anyiah, who stated she slept on the couch, and he observed that the bottom bunk bed was inaccessible for sleeping. The moist clothing was in the living room in baskets. Wilford described finding the animal feces in the laundry area, in the clothing and on the floor, and that area was open to the rest of the house. The State played and admitted into evidence body camera footage taken from another inspector on the scene, which Wilford confirmed was an accurate depiction of the house that day.

¶ 19    On cross-examination from Father's counsel, Wilford stated that the video was taken after the SWAT team executed their portion of the search warrant. Wilford did not attempt to flush the toilet or drain the water in the sink during the search. On cross-examination from the GAL, Wilford testified that he did not see the condition of the house prior to the search warrant being executed, but entered the home after the SWAT team was done with its search. The parties presented no further witnesses or evidence.

¶ 20    The State argued that Mother was previously found unfit due to her usage of methamphetamine and there was no evidence that she addressed those concerns through treatment. The State said that there were drugs and paraphernalia found in Father's bedroom, the ice machine in the kitchen, and in the garage. The drugs in the home were accessible to the minors. Father admitted to being a frequent user of methamphetamine, and Tamara was as well, which created an unsafe environment for the minors.

¶ 21    Father also permitted friends to stay on the property "on and off" while they sold drugs out of the garage. The minors were also familiar with the individuals staying on the property. Father denied direct knowledge of the drug sales but had a camera surveillance system set up with a monitor in his garage. As to the house, the State argued that the conditions were not "necessarily fit" for the minors to be residing there.

¶ 22    Father's counsel asserted that the allegations were in "two sets," one for a "dirty-home" case and the other for a drug use or possession case. As to the "dirty-home" case, the statutory language includes a minor who was not receiving the proper care necessary for the minor's well-being including adequate food, clothing, and shelter. As to the drug use case, the statutory language includes a minor whose environment was injurious to his/her welfare. The minors were reported as healthy and clean with no observable injuries by a doctor in the investigation report. Anyiah's

teacher did not notice any signs of abuse or neglect and Anyiah appeared clean and well cared for. Father's counsel argued that the condition of the minors showed that the home was not dirty enough to cause neglect. Further, Father "went through efforts to keep any drug usage away from the children." The argument that the surveillance system was being used to monitor drug dealing was "entirely speculative."

¶ 23    The minors conducted interviews with Children's Advocacy Center. Anyiah stated that she did not believe Father used drugs and that visitors were not allowed inside the house. Father's counsel stated that "the most troubling fact" was that there was a shard of methamphetamine in the ice machine, which was "presumably accessible to the children." Father denied knowledge of the shard, and there was no evidence that the minors regularly accessed the machine. Father's counsel argued that Father's drug use would not meet the level of neglect necessary to establish *prima facie* neglect. Father's counsel asked that the petition be denied.

¶ 24    The GAL argued that the State met its burden and it was not a "close call." Father used methamphetamine in his bedroom in his home where the minors resided. Multiple controlled buys occurred on his property, and while Father wanted to "claim deniability of that, it [was] still his duty as a parent to ensure that there [were] not drug sales going on on his property where his children reside." Father knew who was selling drugs, and the GAL argued that this knowledge indicated that "he certainly had knowledge or suspicion that the individuals that he was allowing to use his home as a flop house were selling drugs on the property." Father testified that his friends were only allowed in the home when he was present, so either Father placed the shard into the ice machine, or he was present when someone else placed it. The GAL argued that this implied that Father had "knowledge that there was not only drugs present in his room that he used whenever he either needed to sleep or needed to be high, but also that he was aware or should have been

8

aware that there was additional methamphetamine in his kitchen in open access to his children." Further, the videos of the home showed it was uninhabitable for the minors. The GAL argued that the petition of adjudication should be granted.

¶ 25　The circuit court stated that it considered the evidence, exhibits, and arguments presented. The circuit court said that it looked at the totality of the circumstances, including the state of the house and the drug usage or activity on the property. The court considered Mother's admission of the allegation of her previous finding of unfitness. The condition of the house itself "might not rise to the level of injurious environment," despite the cramped living space and piles of debris with only paths to walk through the house. The house needed repairs, and Father said that was due to a lack of financial resources, but the court said significant money had been spent on a surveillance system.

¶ 26　The circuit court found that Father had smoked methamphetamine in the house, and there was "significant drug usage and drug trafficking in the yard." The court was "not convinced" that Father did not know about the drug usage and trafficking out of his garage, and the surveillance system was more likely tied to drug activity than home protection.

¶ 27　The circuit court found that the State met its burden to show that the minors were neglected in that their environment was injurious in counts I and II. The court emphasized that the purpose of the adjudicatory hearing was to determine if the minors were neglected, not which party neglected the minors. The circuit court entered a written adjudicatory order the same day, granting the petition and finding the minors to be neglected, based on the following facts:

"Mother previously found unfit in 23-JA-22 & 23 based on Mother's drug usage creating an injurious environment for the minor & sibling; Mother has not addressed her illicit drug

9

use and has not been found fit. Father used methamphetamine in the home and possessed methamphetamine while minor was in the home; inadequate shelter."

¶ 28 A dispositional report was filed on January 20, 2026. Father did not participate in an integrated assessment for "legal reasons." Father did complete an assessment in 2024, and that information was used to complete the report. Father had a previous indication for substantial risk of physical injury/environment injurious to health and welfare by neglect in 2023 to 2024. Father permitted the minors to be left in Mother's care despite her unfitness. No services were recommended, and the family completed aftercare services. Father also had a history of methamphetamine use, but he declined to participate in any drug toxicology screenings due to his criminal case. Father had a criminal history including assault, burglary, dangerous drugs, fraudulent activity, larceny, obstruction of justice, and traffic offenses.

¶ 29 As to parenting, the report noted that Father had "not demonstrated safe care for his children." The minors were exposed to illicit substances, drug paraphernalia, and unsafe people. Father allowed Mother to care for the children as well. Father "demonstrated limited perceptiveness and empathy to the circumstances of the youth as he does not acknowledge problems or how his behavior has impacted the children's safety and wellbeing." Father even coached and encouraged the minors to not cooperate with DCFS throughout the case.

¶ 30 Father's goals were to cooperate with DCFS and the Center for Youth and Family Services (CYFS); achieve and maintain an alcohol and drug-free level of personal functioning; gain an understanding of mental health and learn and apply coping skills; resolve any pending legal issues and abide by the terms of his probation; gain an understanding of anger management skills and apply them to his daily life; provide for the needs of the minors and make appropriate parenting choices; obtain and maintain a legal source of income; and obtain and maintain safe and

appropriate housing. The report noted that Father did not sign any initial paperwork or consents, did not permit a home check, and did not maintain contact with the caseworker due to his verbal aggression toward CYFS. The report recommended that Father be found unfit, and custody and guardianship of the minors be granted to DCFS.

¶ 31    The matter proceeded to a dispositional hearing on January 27, 2026. The State stood on the dispositional report as evidence, which the circuit court considered. No other parties presented evidence. The State argued that the goal of return home within 12 months was appropriate, and asked that custody and guardianship remain with DCFS and the minors be made wards of the court. Father's counsel stated that he was in support of a return home goal and had no additional argument for the court. The GAL agreed with the recommendations of the report.

¶ 32    The circuit court found that it was consistent with the health, welfare, and safety of the minors to be made wards of the court. Both parents were found unfit as they had not participated in services. The permanency goal was set to return home in 12 months, and custody and guardianship was placed with DCFS. A written order was entered the same day, finding Father unfit and stating that Father needed to comply with the services included in the shelter care report, and granting the petition. Father timely appealed.

¶ 33                                II. ANALYSIS

¶ 34    On appeal, Father argues that the circuit court's dispositional finding was against the manifest weight of the evidence and constituted an abuse of discretion.

¶ 35                          A. Adjudicatory Finding

¶ 36    The Juvenile Court Act of 1987 (Act) (705 ILCS 405/1-1 *et seq.* (West 2024)) provides a step-by-step process to be used in determining whether a child should be removed from his or her parents and made a ward of the court. *In re Arthur H.*, 212 Ill. 2d 441, 462 (2004). Upon the filing

11

of a petition for wardship by the State, the Act provides that a temporary custody hearing shall be held during which the court shall determine whether there is probable cause to believe that the child is neglected, whether there is an immediate and urgent necessity to remove the child from the home, and whether reasonable efforts have been made to prevent the removal of the child or that no efforts reasonably can be made to prevent or eliminate the necessity of removal. 705 ILCS 405/2-10 (West 2024).

¶ 37 Following placement of a child in temporary custody, the circuit court must make a finding of abuse, neglect, or dependence before it conducts an adjudication of wardship. *Id.* § 2-21; *In re N.B.*, 191 Ill. 2d 338, 343 (2000). Section 2-3(1)(b) of the Act defines a "neglected minor" to include "any minor under 18 years of age *** whose environment is injurious to the minor's welfare." 705 ILCS 405/2-3(1)(b) (West 2024). In general, the term "injurious environment" has been interpreted to include "the breach of a parent's duty to ensure a 'safe and nurturing shelter' for his or her children." *In re N.B.*, 191 Ill. 2d at 346 (quoting *In re M.K.*, 271 Ill. App. 3d 820, 826 (1995)). Accordingly, cases involving allegations of neglect and adjudication of wardship are *sui generis* and must be decided on the basis of their unique circumstances. *In re Arthur H.*, 212 Ill. 2d at 463.

¶ 38 At a proceeding for adjudication of wardship, the State must prove the allegations of neglect by a preponderance of the evidence. *Id.* at 463-64. In other words, the State must establish that the allegations of neglect are more probably true than not. *Id.* at 464. The circuit court's findings regarding wardship and fitness at the dispositional hearing stage are given great deference because it has the best opportunity to view and evaluate the parties and their testimony. *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1064 (2006); *In re T.B.*, 215 Ill. App. 3d 1059, 1061 (1991). Because a circuit court is in a superior position to assess the credibility of witnesses and weigh the

evidence, a reviewing court will not overturn the circuit court's findings merely because the reviewing court may have reached a different decision. *In re Lakita B.*, 297 Ill. App. 3d 985, 994 (1998). A circuit court's determination of wardship or fitness will be reversed "only if the factual findings are against the manifest weight of the evidence." *In re Kamesha J.*, 364 Ill. App. 3d 785, 795 (2006). A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly apparent. *In re C.N.*, 196 Ill. 2d 181, 208 (2001).

¶ 39 Father specifically argues that the State failed to prove the minors were neglected because he did not "knowingly expose[ ] the minors to drug trafficking activity" and that the conditions in the home were due to financial limitations. The circuit court relied on the "totality of the circumstances," combining the allegations of drug use and the condition of the home.

¶ 40 The legislature has stated that the purpose of an adjudicatory hearing is "to determine whether the allegations of a petition *** that a minor under 18 years of age is *** neglected *** are supported by a preponderance of the evidence." 705 ILCS 405/1-3(1) (West 2024); *In re Arthur H.*, 212 Ill. 2d at 465. During the adjudicatory hearing, the court hears evidence on the State's petition for adjudication to determine if the minor is abused, neglected, or dependent based on that evidence. *In re Zion M.*, 2015 IL App (1st) 151119, ¶ 23.

¶ 41 Here, the State's petition alleged that the minors were neglected due to Mother being present with the minors despite being unfit and Father possessing methamphetamine in the home of the minors for count I, and unsafe and unsanitary living conditions for count II.

¶ 42 As to count I, Mother, while not the custodial parent, admitted to being present in the home with the minors despite a previous finding of unfitness. Mother was never restored to fitness after the 2023 petitions alleging that the minors were neglected due to her illicit drug use. Father testified that Mother came to his residence regularly to help get the minors ready for school. The circuit

court considered this in its finding because it demonstrated that Father allowed the minors to be in the presence of an unfit adult. Mother had a history of illicit drug use and abuse that led to a prior DCFS case, and she was never restored to fitness through treatment or services. Father chose to allow Mother to see the minors daily to get them ready for school despite the risk she posed. We have previously found that parental conduct that poses a risk can illustrate an injurious environment even if a minor has not yet suffered any harm. See *In re K.F.*, 2023 IL App (1st) 220816, ¶¶ 49-52 (summarizing cases and finding that leaving minors in the care or presence of unsafe adults with a history of child abuse and a "bad temper" (*In re M.K.*, 271 Ill. App. 3d 820, 827 (1995)) or a history of neglect and abuse (*In re Jordyn L.*, 2016 IL App (1st) 150956, ¶¶ 35, 39-40) creates an injurious environment for the minors).

¶ 43    In addition to Mother being in the presence of the minors, Father also exposed the children to illicit drugs and paraphernalia. Father argues that he was not the one selling drugs and attempted to limit the minors' exposure to drugs. However, he admitted that he occasionally smoked methamphetamine in his bedroom, and law enforcement also located a "shard" of methamphetamine in the ice machine, which was not locked and could be accessed by any household member. Father denied knowing of its existence, but admitted none of his friends who stayed on the property were allowed into the home unless he was present. He thus either knew of the methamphetamine, or had reason to know of its existence in the home. Law enforcement also located additional drugs and paraphernalia in the garage, where Father's friends were alleged to have sold drugs. Controlled buys were conducted there, and Father acknowledged that there were "some issues" in his garage but denied any direct knowledge. Father was able to provide law enforcement with the name of the individual who participated in the controlled buys without being

14

prompted. The circuit court stated that it was "not convinced that [Father] did not know about that drug usage and drug trafficking out of his garage."

¶ 44    While Father argues that the minors appeared unharmed due to the circumstances described above, an injurious environment may be found based on parental conduct that poses a risk, even if a child has not yet suffered any harm. *In re K.F.*, 2023 IL App (1st) 220816, ¶ 52. Even if Father did not "knowingly expose[ ] the minors to drug trafficking activity," "neglect is the failure to exercise the care justly demanded by the circumstances and encompasses both willful and unintentional disregard of parental duties." *In re John Paul J.*, 343 Ill. App. 3d 865, 879 (2003).

¶ 45    Father's behaviors of using methamphetamine in the home, the presence of a shard of methamphetamine in the ice machine available to the minors, drug paraphernalia in the home and garage, additional drugs located in the garage, and multiple drug sales occurring on the property show that the minors were neglected. Further, it was undisputed that Mother was regularly in the presence of the minors despite being unfit.

¶ 46    As the circuit court noted, the purpose of an adjudicatory hearing is to determine whether the minors were neglected, not which parent is responsible for the neglect. *In re Arthur H.*, 212 Ill. 2d at 467. Based on the facts described, it was not against the manifest weight of the evidence to find that the minors were neglected due to an injurious environment under count I. "Only a single ground for neglect need be proven, and thus when the circuit court has found a minor neglected on several grounds, we may affirm if any of the circuit court's bases of neglect may be upheld." *In re Faith B.*, 216 Ill. 2d 1, 14 (2005). As such, the circuit court's adjudicatory finding of neglect is affirmed.

15

¶ 47                                B. Dispositional Finding

¶ 48    If the circuit court determines that the minor is abused, neglected, or dependent, then the

matter proceeds to a dispositional hearing at which it determines whether it is consistent with the

health, safety, and best interests of the minor and the public that the minor be made a ward of the

court. 705 ILCS 405/2-21(2) (West 2024).

> "At the dispositional hearing, the court shall determine whether it is in the best interests of
>
> the minor and the public that the minor be made a ward of the court, and, if the minor is to
>
> be made a ward of the court, the court shall determine the proper disposition best serving
>
> the health, safety and interests of the minor and the public. The court also shall consider
>
> *** the permanency goal set for the minor, the nature of the service plan for the minor and
>
> the services delivered and to be delivered under the plan. All evidence helpful in
>
> determining these questions, including oral and written reports, may be admitted and may
>
> be relied upon to the extent of its probative value, even though not competent for the
>
> purposes of the adjudicatory hearing." *Id.* § 2-22(1).

¶ 49    "The purpose of a dispositional hearing is not to terminate parental rights." *In re April C.*,

326 Ill. App. 3d 225, 237 (2001). Rather,

> "a dispositional hearing serves the purpose of allowing the circuit court to decide what
>
> further actions are in the best interests of a minor, and the hearing and ruling on whether
>
> to make a minor a ward of the court gives the parents 'fair notice of what they must do to
>
> retain their rights to their child' in the face of any future termination proceedings." *Id.*

 "[T]he term 'unfit' in the section relating to removing custody and guardianship from a parent

following a finding of neglect differs in meaning from the unfitness required to be found for

16

termination of parental rights for purposes of appointing a guardian with consent to adopt." *In re T.B.*, 215 Ill. App. 3d 1059, 1061 (1991).

¶ 50 Following a determination of wardship and a finding that the parents are unfit, the circuit court is tasked with determining a disposition that best serves the minor's interests. *In re Al. S.*, 2017 IL App (4th) 160737, ¶ 40.

> "Under section 2-27(1) of the Juvenile Court Act, the trial court may commit a minor to DCFS wardship if it determines that the parent is unfit or unable, for some reason other than financial circumstances alone, to care for, protect, train, or discipline the minor and that the health, safety, and best interests of the minor will be jeopardized if the minor remains in the custody of the parent. [Citation.] *** The health, safety and interests of the minor remain the guiding principles when issuing an order of disposition regarding the custody and guardianship of a minor ward. [Citation.] The trial court's determination will be reversed only if the factual findings are against the manifest weight of the evidence or if the court abused its discretion by selecting an inappropriate dispositional order. [Citation.]" *In re Kamesha J.*, 364 Ill. App. 3d at 795.

A circuit court "abuses its discretion when no reasonable person would agree with its decision." *In re M.P.*, 408 Ill. App. 3d 1070, 1073 (2011).

¶ 51 On appeal, Father argues that the circuit court's finding that he was unfit and unable to care for the minors was against the manifest weight of the evidence because the court should not have relied upon his lack of participation in services during a "short period of time" between the minors being placed in the care of DCFS and the dispositional hearing, which was three months. At the time of the hearing, Father had not completed any paperwork, signed any disclosures, did not participate in the integrated assessment, and did not maintain contact with CYFS due to his

17

aggressive behavior toward the agency. The circuit court may consider whether a parent completed all or any of his or her services when determining fitness. *In re R.R.*, 409 Ill. App. 3d 1041, 1046-47 (2011) (incomplete services may be considered when determining fitness). Father had not engaged in any services and did not keep in contact with CYFS for the three months the case was pending. As such, it was not against the manifest weight for the circuit court to find Father unfit.

¶ 52     As to the circuit court's determination that it was in the minors' best interest to remove the minors from the custody of Father, Father only argues, "[T]he circuit court's decision to remove the minors and place custody and guardianship with DCFS, rather than consider less restrictive alternatives, was unreasonable in light of the limited evidence presented at disposition." Father did not provide any further argument or explanation as to how it was an abuse of discretion. Thus, Father has forfeited review of his argument for failing to present well-reasoned argument. See Ill. S. Ct. R. 341(h) (eff. May 25, 2018). Forfeiture notwithstanding, Father's argument that it was an abuse of discretion to remove the minors from his custody still fails.

¶ 53     "The wardship determination is based on the best interest to the child when considering the totality of the circumstances surrounding the child's life." *In re D.S.*, 2018 IL App (3d) 170319, ¶ 15. The circuit court stated that while reasonable efforts had been made to keep the minors in the home, the efforts have not eliminated the necessity for removal. The court also found the service plan to be appropriate.

¶ 54     Based on the totality of the circumstances, we find that a result opposite to that reached by the circuit court as to fitness and wardship was not clearly apparent, and the result reached by the circuit court was supported by the evidence. It was not against the manifest weight of the evidence to find Father unfit and unable to care for the minors, and it was not an abuse of discretion to select a disposition that placed the minors in the custody and guardianship of DCFS.

¶ 55                                    III. CONCLUSION

¶ 56    Based on the foregoing, we affirm the judgment of the De Witt County circuit court.

¶ 57    Affirmed.